IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UCB INC., et al., )
)
Plaintiffs, ) C.A. No. 21-1229-JLH
)
v. )
)
CIPLA LIMITED, et al.,)
)
Defendants. )

Tuesday, May 28, 2024
1:00 p.m.
Courtroom 6D

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE JENNIFER L. HALL
United States District Court Judge

APPEARANCES:

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
BY: MEGAN DELLINGER, ESQ.

-and-

COVINGTON & BURLING, LLP
BY: ALEXA R. HANSEN, ESQ.
BY: KAVEH SABA, ESQ.
BY: MELISSA KEECH, ESQ.
BY: JOHN VEISLEMLEIN, ESQ.
BY: CHARLES HALL, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORRIS JAMES, P.A.
BY: CORTLAN HITCH, ESQ.

-and-

K&L GATES
BY: ANIL PATEL, ESQ.
BY: PETER GIUNTA, ESQ.
BY: ADANI BERLIN, ESQ.

Counsel for the Defendant

-----------------------------

12:59:41 COURT CLERK: All rise. The United States District Court for the District of Delaware is now in session. The Honorable Jennifer L. Hall presiding.

12:59:48 THE COURT: Hi. Good afternoon, everyone. Please be seated.

12:59:52 So we're here today for closing arguments after post-trial briefing. This is UCB versus Cipla. It's civil action number 21-1229. We're here live in the courtroom today, but I understand we also have some folks from the clients participating via teleconference and so I'll remind anyone listening right now to please make sure your phones are on mute and also that any recording of the proceedings today is against the law. It's strictly prohibited. So we'll allow people to listen in, but there's going to be no

recording. We do have a court reporter here taking down the transcript, so that will be available after the hearing today.

Let's go ahead and put appearances on the record, please.

MS. DELLINGER: Good afternoon, Your Honor. Megan Dellinger from Morris Nichols on behalf of the plaintiffs. And I'm joined this afternoon by my co-counsel from Covington & Burling, Alexa Hansen --

MS. HANSEN: Good afternoon.

MS. DELLINGER: -- Kaveh Saba --

MR. SABA: Good afternoon.

MS. DELLINGER: -- Charles Hall --

MR. HALL: Good afternoon, Your Honor.

MS. DELLINGER: -- Melissa Keech --

MS. KEECH: Good afternoon, Your Honor.

MS. DELLINGER: -- John Veislemlein --

MR. VEISLEMLEIN: Good afternoon, Your Honor.

MS. DELLINGER: -- and Eric Sonnenschein.

THE COURT: Hi. Good afternoon to all of you.

MR. HITCH: Good afternoon, Your Honor. On behalf of Cipla, Cortlan Hitch from Morris James. And joining me today is Anil Patel --

MR. PATEL: Good afternoon, Your Honor.

MR. HITCH: -- Peter Guinta --

13:01:24 MR. GIUNTA: Good afternoon, Your Honor.

13:01:26 MR. HITCH: -- and Adam Berlin from K&L Gates.

13:01:28 (Conference line interruption.)

13:01:31 THE COURT: Hi. Good afternoon to all of you.

(Conference line interruption.)

13:01:31 THE COURT: All right. If this kind of stuff
13:01:33 continues, we might just have to flip it off.

(Conference line interruption.)

13:01:46 THE COURT: All right. Let's proceed. Have we
13:01:48 decided how we're going to proceed?

13:01:51 MR. PATEL: Yes, Your Honor. Defendants will go
13:01:53 first. We have a presentation a little bit short of one
13:01:56 hour and then we'll reserve that time for rebuttal.

13:01:59 THE COURT: Okay. So each side gets an hour.
13:02:01 All right. You can go when you're ready.

13:02:06 MR. PATEL: Good afternoon, Your Honor. Anil
13:02:22 Patel from K&L Gates on behalf of the Cipla defendants.

13:02:25 As Your Honor will recall, in October of 2023
13:02:28 the Court held a four-day trial in which each side presented
13:02:32 their evidence with respect to their respective legal
13:02:35 claims.

13:02:36 Cipla presented its evidence that the two
13:02:38 asserted claims of the patents-in-suit are anticipated and
13:02:42 obvious. And I'll focus on each one of those two
13:02:46 contentions here in a second, but I'll start with the claims

of the patents-in-suit.

Your Honor may recall that there were two asserted claims in the patents-in-suit. The first claim is Claim 13 of the '033 Patent. Claim 13 depends from a number of claims above it. I'll kind of break it down for you. Essentially, the claim is to a liquid pharmaceutical composition that is formulated for intranasal administration. And then it requires midazolam or salt and the midazolam is required in a broad range from 0.001% to 20% weight by volume. It also requires a number of excipients; propylene glycol, water, PEG 400 and mPEG 350.

The other claim is broader --

Your Honor, if I may, I should have done this at the outset. Can we hand up copies?

THE COURT: Sure. That's fine.

MR. PATEL: Thank you. My apologies.

The other claim, Your Honor, is a little bit broader. It claims, again, it's to a liquid pharmaceutical composition formulated for intranasal administration. In this case the claim requires midazolam base along with mPEG and mPEG is claimed from N=2 to N=12 volume, but it includes mPEG 350 as one of the mPEGs claimed here.

THE COURT: Can you just remind me -- I didn't mean to interrupt so early, but there was no Markman proceedings in this case, is that right?

MR. PATEL: That's correct.

THE COURT: Do the parties agree that the preamble either is or isn't limited?

MR. PATEL: There was such agreement. The parties --

THE COURT: Do you think the preamble is limiting?

MR. PATEL: In this case, Your Honor, we think the preamble is limiting to the extent that it requires a Liquid pharmaceutical composition.

THE COURT: Okay. Does it have to be formulated for intranasal administration?

MR. PATEL: From Cipla's perspective, it can be formulated for intranasal administration. Formulated just meaning it can used in intranasal administration, not necessarily for only that purpose.

THE COURT: Okay.

MR. PATEL: So what's important to understand, Your Honor, is not only what the claims require, but what they do not recite.

Notice that this is not a method of administration claim at all, so there are no claims -- the claim does not require any specific indication. It certainly does not require acute repetitive seizure as one of the indications.

It is not -- it is also -- there are no limitations to viscosity, there are no limitations to pH, no limitations of safety, no limitations of stability. None of those are requirements of the claim. I'll come back to that when we talk about the various issues, but it's important to know what the objective reach of the claim is and what the objective reach of the claim is not.

THE COURT: And that's what I want to ask you about. So there's no specific requirements for a particular viscosity, but you agree that it has to be of a viscosity that would be appropriate for intranasal administration?

MR. PATEL: Yes, we agree, but that could be achieved through a modified device or unmodified device.

THE COURT: Right. Okay. But you do agree that that intranasal administration, whatever there is, it has to be suitable in its viscosity, it has to be suitable in its sprayability, it has to be suitable in terms of having a therapeutically effective amount, which I guess is already in the claim, yes?

MR. PATEL: Yes, I agree.

THE COURT: Okay.

MR. PATEL: Your Honor, for both anticipation and obviousness, it's important to know what the qualifications of a person of ordinary skill in the art are. And here you'll see that Cipla has contended that the person

of ordinary skill in the art has a degree in pharmacy, pharmacology, pharmaceutics, chemistry, drug delivery, engineering, medicine, or related discipline. And then they have a doctorate or masters in that -- a degree that is a doctorate or masters with two or four years practical experience in pharmaceutical formulation or administration. They also have access to individuals who have expertise in chemistry and medicine.

UCB's definition is very similar. The only substantial difference is that they require a POSA to have experience specifically in pharmaceutical intranasal formulation. But under either definition of a POSA, Cipla contends the claims are anticipated and obvious.

I'll move first to the obviousness analysis, Your Honor.

In this case Cipla's contention is that all of the limitations of both of the claims are explicitly disclosed -- all of the limitations are disclosed in the *Wermeling '359* publication. Now there is no dispute between the parties that all of the limitations are explicitly disclosed in the *Wermeling '359* publication except for the requirement that it be mPEG 350. And so that essentially is the dispute between the two *Wermeling '359* publication discloses mPEG 350.

I have where the *Wermeling '359* publication in

13:08:17 this chart discloses each one of the limitations, but it's important to note that the focus here is on mPEG 350. And the *Wermeling* publication discloses non-aqueous diluents as part of the intranasal formulation. And the non-aqueous diluents can include alcohols, particularly polyhydroxy alcohols, and then it says such as propylene glycol, polyethylene glycol and so on.

13:08:41 And we contend -- Cipla contends that a person of ordinary skill in the art, when viewing the *Wermeling '359* publication, would see the terms alcohol and polyethylene glycol as including mPEG 350.

13:08:54 And that's essentially the contention, the point of dispute with respect to the other claim as well, whether Wermeling *'359* discloses the mPEG limitation of the other claim as well.

13:09:06 Your Honor, it's important to note that when viewing anticipation and when viewing the anticipatory reference, you are allowed to look at extrinsic evidence to understand how one of ordinary skill in the art would view, for example, the terms used in the anticipatory reference. That includes testimony of a POSA and other references that show or that explain what a term means, not expand upon, but just explain what a term means. And we have cited to such references and we've provided supporting testimony for those references.

Here's -- here's the *Tracey* reference, which is a prior art reference that has an entire paragraph on polyethylene glycol polymers, define them as liquid and solid polymers of the general formulas, then has the formula. But what you will note, Your Honor, is on the bottom here, the highlighted part says, for example, the PEG can be PEG 200, PEG 400 or mPEG 350, which is also referred to as monomethoxy PEG, because they're all liquids at room temperature.

This reference is indicating to a POSA that in the context of formulations, when we refer to PEG, especially when we talk about liquid PEG, PEG 200, PEG 400 and mPEG 350 come to mind.

You'll hear a lot about the *DOW Brochure* because it's one of the two references that form the basis of Cipla's obviousness contention. But I want to talk about *Dow* in the context of anticipation as well and what it teaches one of ordinary skill in the art.

Now, with respect to the *Dow Brochure*, it's important to recognize right away that it's only focused on PEGs and mPEGs, nothing else. It's a brochure that tells you the different uses of PEGs and mPEGs. It defines PEGs and mPEGs as a family of water soluble linear polymers and then it shows a chart that shows the CARBOWAX PEGs and mPEGs and only six of them are listed as liquid, which is PEG 200,

300, 400, 600 and then mPEG 350 and 750.

So again, just kind of supports the understanding of a person of ordinary skill in the art that in the context of the *Wermeling* reference, where he's referring to liquid formulation, liquid intranasal formulations, that when one sees the use of alcohols and polyethylene glycol, one would know that to mean and include mPEG 350.

That's not inconsistent with the internal understanding within ITI. This is an internal ITI doc and it's focused on mPEG and it specifically says -- it first shows the structure of mPEG and then right below it it says, "mPEGs are essentially polyethylene glycols with a terminal methoxy group." Again, it's referring to mPEGs as essentially polyethylene glycols, which is consistent with what Cipla is contending and what Dr. Wermeling contends for why the asserted claims are rendered anticipated.

I want to stop there on anticipation, Your Honor, because that's Cipla's first position that both of the asserted claims are anticipated in view of the *Wermeling '359*. But even if they were not anticipated, both the subject claims are obvious in view of *Wermeling '359* and the *CARBOWAX Brochure*.

I want to talk about obviousness next, but before I do, I want to just kind of give a general summary

of the use of midazolam even prior to the patents-in-suit.

As Your Honor will recall during trial, we provided testimony that IV midazolam, intravenous midazolam had been approved since the 1980's. And the intranasal use of intravenous midazolam had been widely studied and Dr. Wermeling provided a number of references that study the intranasal use of IV midazolam, which was a dilute solution, meaning it was not concentrated because it was designed for IV, but nonetheless used for intranasal purposes.

Not only did we present evidence that it was widely study, it was therapeutically effective and safe. Moreover, it was not only widely studied, but intranasal IV midazolam was widely used including for the treatment of ARS and we provided a number of references that support that contention. And there was a medical consensus there as well that it was safe and effective for its intended use. It was not optimized, because again, it was an IV formulation, but if it worked, that's the bottom line, it did work for its intranasal purpose.

Then the focus shifted to actually making concentrated solutions of midazolam specifically designed for intranasal use. And so even before we get to the *Wermeling* publication, there are three references that I want to point out that show use of concentrated midazolam formulation for intranasal use.

One of them is the *Knoester* reference. And you will remember that the *Knoester* reference disclosed 2.5 milligrams of midazolam hydrochloride in 90 microliters of solution, which is acceptable for intranasal use being only 2.5 milligrams and 90 microliters. It had favorable bioavailability and it was therapeutically effective.

The second reference, it's an important reference, it's the *Bechgaard* patent. If you'll remember, the *Bechgaard* patent, Dr. Gizurarson was one of the inventors of the *Bechgaard* patent and Dr. Gizurarson is obviously the only inventor of the patents-in-suit. In fact, not only was he an inventor, it looks like a lot of the examples in the current patents-in-suit were copied from the *Bechgaard* patent. A lot of these examples were not followed through, they were just dissolved and none of the other studies were done.

*Bechgaard* patent --

(Conference line interruption.)

MR. PATEL: So the *Bechgaard* patent disclosed formulations containing glycol furol, PEG, propylene glycol and water. And more specifically, it disclosed an example of midazolam in PEG 200. It also - this is very important in terms of motivation - it suggested improvement in sprayability. And the sprayability can be improved by lower viscosity and viscosity can be lowered by adding PEG

derivatives. Moreover, it said formulations can be optimized, can be optimized for bioadhesion, sprayability and viscosity. These were all teachings of the *Bechgaard* patent for which Dr. Gizurarson was one of the inventors.

And then the *Merkus '893* reference, Your Honor, that one disclosed generally midazolam base as well as midazolam hydrochloride. And then it disclosed exemplary formulations containing 35 to 75 milligrams per mil of midazolam hydrochloride, which is, again, acceptable for nasal administration, that concentration is, along with midazolam hydrochloride, propylene glycol, PEG, glycerol, povidone and water, some of the same excipients that are claimed in one of the patents-in-suit, one of the claims that is asserted.

And it also said -- again, this is an important takeaway from *Merkus* -- is that propylene glycol and PEGs are both effective solubilizers of midazolam. So this is the understanding of a person of ordinary skill in the art -- just briefly, that's the optics with which a person of ordinary skill in the art would view the *Wermeling '359* reference along with the *CARBOWAX Brochure*.

I'll now turn to the actual claims. Again, as I mentioned earlier, it's undisputed that all of the elements of the asserted claims, both of the asserted claims, are disclosed in the *Wermeling '359* reference except the mPEG,

mPEG 350, which is the point of dispute. But there's no question and it's not disputed that mPEG, including mPEG 350, is disclosed in the *Dow Brochure* explicitly.

So the question before the Court, Your Honor, is essentially was there motivation to combine the *Wermeling '359* publication with the *Dow Brochure*, meaning was there motivation to use mPEG in a known intranasal midazolam formulation that already contained PEG? And Cipla submits, Your Honor, there was more than enough motivation.

First, before I get to the other claim, the same point of dispute is the mPEG limitation here. The case law with respect to *KSR*. *KSR* is very clear that the obviousness analysis is not rigid, it's flexible, you look at it from the view of a person of skill in the art and consider the prior art and how close it is to these asserted claims.

Combination of familiar elements according to known methods is likely to be obvious if it does no more than yield predictable results. And when you have a structure -- when you have a patent claim and you have a structure and you have known structure that's very similar, that exchange will be obvious unless it does more than yield a predictable result. And that is exactly what's happening between PEG and mPEG in this case. I'll talk more about that.

They talk about different ways a POSA would have

went, but it's important to note that a POSA can be motivated by more than one thing and in that case the defendant did not need to show that that was the single motivation as long as it's one of the motivations. So obviousness does not require that the motivation be the best option, only that it's a suitable option that would motivate one to combine the two prior art in this case.

So I'm going to discuss two motivations, Your Honor in detail, interchangeability and viscosity. And based on the time, I may just defer to the briefing for tolerability. You can find motivation -- any one of these is sufficient to find motivation to combine. And you can also, because the facts are very similar and the references support more than one motivation, you can use a combination of these motivations to find that there's a motivation to combine the *Wermeling '359* formulation and put mPEG in it from the *Dow Brochure*.

So first, interchangeability, Your Honor, it has long been recognized that chemical compounds with similar structures will have similar properties. And the greater the structural similarity between compounds -- and this is the Fed Circuit case from just six years ago. The greater the structural similarity between the compounds, the greater than motivation to combine and greater reasonable expectation of success.

In this case the facts are that -- this is Dr. Wermeling. If you'll recall, he was Cipla's formulation expert. Dr. Wermeling testified that "PEG 400 has similar molecular weight and was known to be an effective solubilizer for midazolam; that was known.

And that PEG 400 and mPEG 350 have very close structural similarity, probably 98, 99% of the molecule is the same. Just that one little terminus end.

So would I have expected mPEG 350 to solubilize this similar to PEG 400."

The idea being that the structures are so similar that within the context of the ability to solubilize midazolam. Just because PEG 400 solubilized midazolam, mPEG 350 would also be expected to do the same.

He goes on, "they're about 99% homologous, so the minor changes on the terminal end. That's the truth of it."

Then he also says, and this is very similar to the point I just made, "And then if you were to use midazolam base, then it would like to be in like, so it would want to be in an organic system." The idea being that midazolam dissolves in PEG because it is an organic solvent and because mPEG is a very closely related organic solvent to PEG, midazolam would be expected to dissolve in mPEG 350 as well.

13:21:38 I want to talk about two cases and kind of draw a parallel to those two cases in terms of interchangeability being a motivation to combine.

13:21:48 This claim -- the *Almirall* case is from two years ago at the Federal Circuit. And the *Almirall* case was a claim to a dapsone formulation. And that claim required a specific gelling agent and that gelling agent is called Sepineo. Sepineo was the gelling agent that was claimed in the dapsone formulation. The prior art disclosed all of the limitations of the claim except for that specific gelling agent. And so the primary piece of prior art, instead of Sepenio it had Carbopol as a gelling agent.

13:22:24 There was a second piece of prior art that in a limited, in a small set of preferred gelling agents, had both Carbopol, which is the gelling agent that I first referenced, and Sepenio, which was a claimed gelling agent. And the Court found that one of ordinary skill in the art, looking at the two prior art, knowing that Carbopol and Sepineo were categorized as a limited set of gelling agents that can be use, the Court found those two were interchangeable and the claim at issue in that case was obvious.

13:22:55 *In re Omeprazole* case -- I think we got font over font, so my apologies for that. It's a very similar case and in this case it was a process claim. In this case

it was a process claim that required an alkaline reacting compound, an ARC. And the claim claimed three specific ARCs. It claims a salt of phosphoric acid, carbonic acid or silicic acid. That was the requirement of the claim, it has to be one of those three alkaline reacting compounds.

The prior art disclosed arginine as the ARC, the alkaline reacting compound and the Court credited, in expert testimony, that it would have been obvious to replace the arginine, which was a known ARC, for one of the ARCs of the claim. And again, interchangeability by itself was sufficient to provide motivation to combine.

And in other cases very similar, because if you draw an analogy to the *Almirall* case, you have the *Wermeling* formulation that discloses a number of excipients including PEG, midazolam and PEG, right, and then you have the *Dow Brochure* that has PEG and mPEG that talks about many of the similar properties of PEGs and mPEGs, including them being widely -- a large number of compounds being soluble in each. And so you have one claim with PEG -- one formulation with PEG in it and then you have something that talks about common properties of PEG and mPEG. And so again, one of ordinary skill in the art would understand them to be interchangeable and I'll show the the specific disclosures in *Dow*.

THE COURT: Let me ask you, though. I just want

to make sure I understand your position.

I understand your position about interchangeability with respect to it would soluble the active ingredient and that it would have a viscosity that would be predictable. But you agree, don't you, that -- and there was some -- I'm not going to dispute there was some evidence at trial, but you would agree that a person of skill would have had to have recognized that mPEG would have been suitable or use in intranasal formulation? You agree that that's part of the test?

MR. PATEL: Yes. So mPEG would have to be suitable for intranasal formulation and for the points I'll talk about. But that role of MPEG, suitable for intranasal formulation, would be limited to it acting as a solvent. I don't think it goes as far as to say that it would then have to be necessarily subject to an FDA approved product.

THE COURT: Well, let's not go that far, but let's go a little bit farther. Does it have to work?

MR. PATEL: It has to work for an intranasal formulation, correct.

THE COURT: It does.

MR. PATEL: Yes.

THE COURT: And does that include being safe to be used for an intranasal formulation?

MR. PATEL: It has to have a certain level of

safety. Not, again, for FDA approval purposes.

THE COURT: But it couldn't be poisonous, for example.

MR. PATEL: Yes, that's correct. And there's no evidence in the record that it was poisonous.

THE COURT: Well, there was some evidence in the record about some other prior art formulation remodeling bones, right? If it did that, would that be -- I mean, do you see the question I'm having here? There's no claim construction here, so I agree that it doesn't mean FDA approval, but it does of to work and it does of to be safe. There's some implicit requirement in the claim because it says intranasal formulation, you agree with that?

MR. PATEL: That's correct.

THE COURT: Okay.

MR. PATEL: And so we have the *CARBOWAX Brochure*, which I was going to turn to next. And as I indicated, Your Honor, it shows the similarities between mPEG and PEG. And in this case, again, to remind you, it only discusses mPEGs and PEGs. The brochure has no other family of compounds except for the family PEGs and mPEGs.

As I mentioned earlier, it talks about the fact that PEGs and mPEGs are a family of water soluble linear polymers and it has the specific structures there. It also says that the PEG and mPEG provided by *Dow* "meet all

applicable requirements of the *United States Pharmacopeia*," meaning suitable to be used in a pharmaceutical product, both PEGs and mPEGs.

It also says that "The physical properties of CARBOWAX PEGs and mPEGs depend on molecular weight." It's important to notice that they're saying it depends on molecular weight. There's no distinction drawn between PEGs and mPEGs specifically besides that.

And then it says, "intermediate physical properties can be achieved successfully by blending PEGs and mPEGs." That includes -- there's a separate part of *Dow*. If you'll recall, says if you want to target viscosity, you can use a blend of he PEGs and mPEGs to target viscosity as well.

The last quote is particularly important. It says, "A wide range of substances" -- this was the point I was alluding to earlier when I was drawing an analogy to the *Almirall* case. "A wide range of substances are soluble in CARBOWAX PEGs and mPEGs." "Useful in a wide variety of formulated products." Again, no distinction drawn between the two. It's saying a wide range of substances are soluble in PEG and a wide range of substance are also soluble in mPEG. Suddenly implies that's an overlapping range in terms of substances that would be soluble in each.

*Dow* reference to the *U.S. Pharmacopeia*. This is

a prior art version of the *Pharmacopeia*. It lists only 37 solvents that again these are listed not just generally but listed as solvents that can be used in a pharmaceutical formulation and you'll notice that four of those are just various grades of water. But then specifically it discloses propylene glycol, but you will see that it then discloses polyethylene glycol and right below it is polyethylene glycol monomethyl ether, which is another name for mPEG. Not only does the *Dow Brochure* show the similar properties, including similar solubility properties of mPEG and PEG, but then you have the *United States Pharmacopeia* that lists both as commonly used solvents.

And this kind of goes to your point, Your Honor, which is -- and I'll address that point at random parts of my presentation, but mPEG had been used in a topical administration before. In this case, mPEG 350 specifically had been used as a topical gel. So there was an FDA approved product at the time that had mPEG. Before that product, they had the patents-in-suit that had mPEG used in a topical gel.

So in terms of being safe, Dr. Wermeling testified to this, one would expect a product that is used in a topical gel to be also safe and effective. It just has to be a reasonable expectation, Your Honor, not absolute predictability.

And one would reasonably expect it would also be safe and effective for intranasal formulation. And we don't have to go far to support that. This is a specification of the patents-in-suit. The specification of the patents-in-suit discloses a number of excipients. And then it has this language. It says, "The foregoing list of excipients and additives is by no means complete, and it is understood that a person of ordinary skill in the art can choose other excipients and additives from the GRAS," the generally regarded as safe list of ingredients, "list of chemicals used in pharmaceutical preparations and those that are currently allowed in topical and parenteral formulation."

So the patent-in-suit itself recognizes that there can be crossover and a person of ordinary skill in the art would be comfortable with that crossover in terms of being able to use an excipient used in a topical administration in an intranasal administration.

Your Honor, "The motivation to combine inquiry for drug formulations is not limited" -- this is the point you made earlier and I think you agree with that, which is that the objective reach of the claim is not as far as kind of getting to an FDA approved product, it's just what's suitable for intranasal administration.

And the expectation is consistent with the facts

as well. You will see that an internal study done, MPEG -- of midazolam is comparably soluble in both mPEG 350 and PEG 400. And the conclusion is the same, it says, "The saturation solubility of midazolam in mPEG 350 and PEG 400 were comparable."

And Dr. Smyth, the formulation expert for UCB, admitted as much. He said that, it's very routine -- would be routine in the art to do midazolam solubility testing in different solvents. Doesn't take long to figure out if midazolam would be soluble in mPEG.

And then there was this internal deck. We had extensive testimony in the form of a deposition testimony for the inventor of the patents-in-suit, Dr. Gizurarson. And Dr. Gizurarson presented a slide deck internally to talk about his mPEG. He says -- and the first bullet point is telling. He says, "Replace all formulations where PEG has been used, with mPEG!" He's not making any kind of caveats, any kind of restrictions. He's basically saying any formulation that you can find that has PEG, just replace it with mPEG, because then I have a patent on it. He doesn't say anything else about the distinction between the two.

In fact, when pressed at deposition to say, what in the slide deck -- are there any statements that you make in the slides that show a difference between mPEG and PEG that matter, he says yes, but all he points to is a chemical

formula. When he's pressed further, besides the chemical formula, what else in your deck shows any differences between mPEG and PEG? And again, he says -- well, he doesn't say nothing, but he just says I'm suggesting that formulations are replaced using mPEG instead of PEG.

Your Honor, I'll move on to the second motivation for obviousness that Cipla contends, which is viscosity. Again, you alerted to this earlier in terms of the scope of the asserted claims.

Cipla contends that one of ordinary skill in the art would have taken the *Wermeling* formulation and will have been motivated to lower the viscosity of the *Wermeling* formulation so that it can be used with a standard device as opposed to a modified device.

And then the first quote here is from the *Wermeling '359* reference, where Dr. Wermeling recognized that his compositions were on the higher viscosity side and that for that reason he had to use a device that was modified and then Dr. Wermeling testified at trial that there would be a motivation to use a standard device as opposed to a modified device. And he says, "if you made a change to the approved device, that would be subject to review, and that you would also be trying to approve a new device." So the motivation is to go through a standard device because it makes the FDA process easier.

Well, what would be required to go to a standard device?

This is just further testimony, that "it would be known by a POSA that the change to the device would raise questions with the FDA since that's not what's on file."

So again, there would be an obstacle if you tried to go with a modified device.

And Your Honor, just to be clear, motivation does not have to come from a primary reference. Motivation doesn't have to come from any references at all.

Here we see to a case that we've submitted after the briefing, the *Janssen* case from just two months ago. It says, "Contrary to the Court's assumptions, the '548 protocol did not need to hold itself out as flawed for a person of ordinary skill in the art to alter it."

In that case the '548 was a primary reference and, in fact, "Motivation may be found in many different places and forms," and it doesn't have to be expressly stated in any reference, it can be just understood that if you wanted a standard device, the way to do it would be to lower the viscosity.

And when Dr. Wermeling was posed with the question, "what do you mean by 'optimize prior art formulations'?" He said, "but if it didn't form a plume, then you would make these modifications to use

lower-viscosity solvents as a substitute for higher-viscosity solvents," because by doing so you would expect the viscosity of the formulation to be lower.

Dr. Ghaderi, who was the Director of Formulation internally at ITI, also testified consistent with that idea. He said, "As a formulator, I can tell you, if you have a high viscosity - you don't want to deal with that kind of formulation. You always strive to go to the lowest possible viscosity."

He further went on to say, "As a formulator, I would absolutely go with the lower viscosity based on the knowledge, the common knowledge that lower viscosity is your friend."

What does the *Dow Brochure* teach us about the viscosity of the respective PEGs? So here you have -- and the highlighting is at the wrong place, so again, my apologies, Your Honor. If you compare the viscosity of the PEG 400 to the mPEG 350, it's clear that mPEG 350 has a lower viscosity as compared to any of the PEGs, including the PEG 400. So there's that motivation that one would understand that adding mPEG into a formulation and replacing that and taking out a more viscous solution will result in overall lowering of the viscosity of the formulation.

And Dr. Wermeling again testified consistent with that when he said "mPEG was the least viscous PEG in

the table. Midazolam is known to be soluble in PEGs. And that prior art formulations were already shown to be effective in treating a patient."

We also asked Dr. Lusty, who is the Vice President of Pharmaceutical Development at ITI. We also asked him a similar question and he said "MPEG350s and PEG400s viscosities are -- that's almost an order of two magnitude difference in viscosity. That's very meaningful in nasal drug development."

And again, just reminding Your Honor that viscosity can be one motivation, it doesn't have to be the only motivation. It doesn't even have to be the best motivation, just has to be a suitable motivation. And in this case it is suitable -- using mPEG is a suitable motivation considering it has the lowest viscosity of the available PEGs and you would expect that it would lower the viscosity of the formulation and that it would be compatible with an unmodified device.

And again, to the point earlier, that you don't need, in the prior art, safety and efficacy data in order -- and you kind of just ignore prior art because it doesn't have the safety and efficacy data. Whereas here, similar to this case, the claims of that case did not require -- did not have any specific safety and efficacy requirement.

13:38:48 THE COURT: Can I ask you -- could you go back
13:38:50 to the chart with the *CARBOWAX Brochure*? Okay. Thank you.
13:39:09 MR. PATEL: Your Honor, in the interest of time,
13:39:11 I'm going to skip the third motivation, but we briefed that
13:39:15 tolerability is another motivation for using mPEG.
13:39:19 I want to have enough opportunity to address
13:39:22 reasonable expectation of success.
13:39:26 And, Your Honor, this is again going to your
13:39:37 point earlier. Not only were mPEG and PEG interchangeable
13:39:41 and again there was motivation to lower the viscosity by
13:39:44 using mPEG, there would have been a reasonable expectation
13:39:47 of success that if you put mPEG in an intranasal formula it
13:39:51 would be suitable or intranasal administration.
13:39:54 First of all, the fact that mPEG and PEGs were
13:39:57 interchangeable, one would have expected mPEG to work
13:40:00 similarly to PEG because of the similar structures including
13:40:05 as solvents as *Dow* indicates.
13:40:07 Second, the claims do not require that -- and
13:40:09 again, I mentioned this earlier. The claims do not require
13:40:11 that it be an FDA approved product, just that it would be
13:40:15 expected to serve as function in an intranasal
13:40:18 administration, which is to help dissolve mPEG and lower
13:40:21 viscosity. And in fact, in any case, even if you wanted to
13:40:25 look at -- needed to look at FDA approved product, as I
13:40:28 mentioned earlier, there was an FDA approved product that

used an mPEG as excipient that was a topical gel. And what's more telling here, the box on the right, this is an internal document and it's a correspondence with the FDA during the process of getting the NDA approved where they cited -- to support the safety of mPEG, they cited to the fact that mPEG 350 was an ingredient in four topical products, Solaraze, Vibrel, Dial and the fourth one, the soap. And also, they said, "optimized MZ NS formulation contains mPEG 350, an inactive ingredient that is listed in the FDA's ingredient database," so they used that to support why mPEG would be expected to be safe. Then they used the fact that it is already used in commercial products to support that it would be safe and they used that to support moving to clinical studies.

So this is to your point, again, maybe not to the FDA approval, but it's certainly expected because of its use at the time. It's certainly expected that it would be also safe. There would be a reasonable expectation that it would be safe in a midazolam intranasal formulation.

And this is Dr. Fisher, the Chief Scientific Officer at ITI, he was asked a question, "Why was it helpful" -- he was asked a question about the document.

"Why was it helpful to have the package inserts?" And he said, "To support safety."

"And how would these package inserts support

13:41:56 safety?" He said, "Because they are approved products." 13:42:00 Again, going to the point that there's a reasonable 13:42:02 expectation that MPEG would also work. And it's certainly 13:42:02 sufficient to move to clinical stage.

13:42:09 And this is Dr. Wermeling when posed with the 13:42:12 question, "Have you analyzed whether a POSA would reasonably 13:42:15 expect an intranasal midazolam formulation containing mPEG 13:42:20 350 to be safe to administer to a patient?" And he said, 13:42:23 "it was used as a topical agent. It was also disclosed in a 13:42:27 formulation that is a mucosal exposure...and that PEGs, 13:42:33 themselves, had been used in other intranasal formulations 13:42:35 and approved." So that was his reasoning for why one would 13:42:38 also expect MPEG to be safe and effective similar to PEG, 13:42:41 safe similar to PEG.

13:42:45 Now I'll stop here, Your Honor, in terms of 13:42:50 Cipla's prima fascia case of obviousness. Cipla's strong 13:42:55 prima fascia case of obviousness. And now I'll go on to 13:42:57 plaintiff's secondary considerations, which are nowhere 13:42:59 close to sufficient to overcome the strong case of prima 13:43:03 fascia obviousness. And I'll start with the nexus 13:43:05 requirement.

13:43:07 Your Honor, the case law is very clear that 13:43:12 there is no nexus if it does not -- if it does not result 13:43:15 from something that is claimed and novel. And also, nexus 13:43:20 must be directed to what was not known in the prior art.

13:43:24 And I'll talk more about why this case law applies in a second. And they say that there's a presumption of nexus because Nasolam -- they say there's a presumption of nexus because Nasolam is an embodiment of the asserted claims. But presumption requires more than that; it requires not only that it's an embodiment of the asserted claims, but also that it is co-extensive with the asserted claims, meaning that it has to represent a wide scope of the claims not just one embodiment. A presumption of nexus, in any case, even if there was a presumption, is rebuttable by evidence that the preferred objective evidence was due to something else besides the claimed invention.

13:44:14 So I won't to remind you of the claims again, but I have them in here to keep in mind with that when you examine secondary considerations you still of to keep in mind the objective reach of the claim and not something that's beyond the objective reach when you consider the secondary considerations.

13:44:28 The first one I want to talk about is plaintiff's contention that others tried and failed. It's quite the opposite, Your Honor. The evidence of record shows that there was a number of successful intranasal midazolam formulations. We just talked about the *Wermeling* formulation. We have been talking about it. There was also Nasolam, and then *Knoester*. Nasolam. That's how I'm going

to pronounce it. Nasolam is the Merkus formulation. And what was known at the time is that all three of these, not at the time, Your Honor, but it was known that all three of these had Cmax, had comparable Tmax and had comparable bioavailability, meaning there were already intranasal formulations in the prior art that were bioavailable essentially. And Dr. Wermeling testified to that in each variable. He said probably all of them are very similar on maximum concentrations. The *Wermeling* product had a higher Cmax. So he's saying they're comparable, maybe *Wermeling* had a very high Cmax. In terms of Tmax, he again said they all have clinically relevant time. And then in terms of the bioavailability, he said they're comparable, lowest bioavailability belonged to Nayzilam.

The point here is that they're saying there was a failure of others, but there are already three examples in the prior art where there were concentrated midazolam formulations that were available and two of them are widely used, as I'll show you in a couple of slides.

Internally, ITI also recognized that point. So in this case, internally they were doing the testing of which formulation to go forward with. Formulation A is a test formulation, the formulation that they ultimately decided to go forward with is, Formulation A. And then Formulation E is essentially the *Wermeling* formulation which

they refer to as the Control Formulation. And they recognized internally that Formulation E had the highest bioavailability.

Dr. Gizurarson himself opined on this data. He said that "your previous Formulation E has Tmax around 4 minutes, which is excellent."

Dr. Privitera, who is Cipla's medical expert, if you'll recall, he was asked a question about the Cmax and AUC values of the *Knoester* and the *Wermeling* formulations as compared to Nayzilam. And he also testified that "the *Knoester* and *Wermeling* formulation would deliver midazolam comparably to Nayzilam."

And again, a more telling fact, Your Honor, "50,000 units of intranasal midazolam," the Nasolam formulation, "have been dispensed since 2017 in the Netherlands, Norway and Sweden." So they had been widely used across the world, across those three countries.

More importantly, "Over 1 million units of intranasal midazolam (known as the *Knoester* formulation) have been dispensed in the Netherlands over the last 20 years."

So again, in terms of failure of others, not only were others were successful in making concentrated intranasal formulations, but some of them were widely used, including over 1 million units being sold.

What did they point to? They point to a number of what they call alleged failures that were active ingredients that is not midazolam. And again mthe scope of the claim is to make a midazolam formulation for intranasal administration, not any other benzodiazepine formulation. What they cite to are other benzodiazepines besides midazolam.

The failure, Your Honor, has to be tied to failure to make a midazolam formulation, not failure to make any other active formulation, because that's the scope of the claim. It's restricted to a midazolam formulation. And in any case, all of the examples they cite to went to clinical stage, which means they were able to achieve a formulation that was at least ready for clinical stage and ready for trial before they were dropped for various reasons. And then a number of the examples they give, there is no proof that they were dropped for technical reasons.

And that's the last point, again, the most important point, that each formulation -- they were successful in making the formulations and each one went to at least Phase I trials.

And again, the case law is very clear here, Your Honor, that only technical failures are relevant. And if the failure is something besides a technical failure, it's irrelevant to a secondary consideration, at least with

respect to the scope of the claims at issue here.

I want to move on to long-felt but unmet need. Again, just a couple of citations from case law. "If prior art products were effective for the purpose of the claimed invention, then there is no long-felt need." Meaning if you have prior art formulations that were already effective and I've already talked about a few, then there is no long-felt need.

On top of that, the fact that Gilenya, the second point here, that just because the product in question is the first commercially marketed product does not overcome the fact that there were other products available even if they were not commercially marketed. For example, the *Wermeling* formulation in this case.

So what were the treatments available for the treatment of acute repetitive seizures. Well, first there was an FDA approved Diastat, which is rectal administration, if you'll recall, that was FDA approved for treatment of acute repetitive seizures in a wider patient age range than Nayzilam. There were also oral medications available, including oral lorazepam, diazepam, clonazepam and midazolam. These were off label uses, but they were frequently indicated for ARS. And then there was compounded IV intranasal midazolam, which I've spoken extensively about and there was also buccal midazolam. And then there were

the concentrated nasal midazolam formulations, including the very two had that I said had been widely distributed in Europe.

So Dr. Privitera, he was asked, "What do the authors state regarding the likelihood of finding a single treatment for ARS?" He was opining on a very specific reference, the *Gidal 2020* reference and he said, the conclusion of the authors in that paper was that it was "highly unlikely that any single medication or delivery system would suit all patients."

During the opening I referred to it as a menu of items. There was a menu of items available for the treatment of ARS dependant on a number of things, including the patients profile, how often the patient has seizures, the time between the first and the second seizures and other factors. So depending on the patient's profile you have a menu of items available and Nayzilam was added to that menu. That's hardly a long-felt but unmet need.

Dr. Klein, first of all, he admitted that IV midazolam used intranasally was common. He had never done it, but he admitted it was common.

Also, as I mentioned, one of the criteria that is considered -- one of the criteria that is considered, Your Honor, in deciding which medication to prescribe, is the time between seizures. And I'll flip through this

quickly in the interest of time, but Dr. Klein admitted that a majority of seizures, time between seizures is more than four hours, at which point another medication, and not Nayzilam, is the ideal choice and he admits as much when he says, "for a patient with ARS," where the second seizure is "expected after four hours," "Valtoco would have been the better choice; would you agree?" And he says yeah. He says, "That is what I usually think."

Just to remind you, Valtoco was another approved -- it was approved a few months after Nayzilam, but it was also an intranasal administration and it was also for the treatment of ARS.

And then Dr. Klein said, between Valtoco and Nayzilam, the split of what he prescribes is 50/50.

And again, even more telling is Dr. Privitera, Cipla's expert, he says, even now, 50 percent of the patients with ARS he prescribes oral lorazepam to and then the majority of the remaining is split 20% each between Nayzilam and Valtoco.

And then they also cite to copying in support of the secondary considerations. First of all, in the ANDA context, copying is not probative just because there are FDA requirements of bioequivalence. And that's exactly what happened here.

First, it's important to note that Cipla was

able to make a formulation containing midazolam hydrochloride that was highly bioavailable and Dr. Smyth admitted to that when he reviewed that document. He said, "Well," -- he was asked, "You testified that before Cipla copied, according to you, that they had failed to make a suitable intranasal midazolam formulation, correct?" He said, "Well, they did make one, and it had higher bioavailability." And he was further asked, "It's fair to say that one that had higher bioavailability would not necessarily be considered a failure, correct?" And he said, "It potentially could have been successful."

And the ultimate reason -- I'll skip this slide. And the ultimate reason Cipla decided to pursue an ANDA is because the formulation that was highly bioavailable would not have been within the scope of what the FDA requires for an ANDA because it will have been a salt and you needed to have a midazolam base in order for it to be an ANDA application. And Dr. Kalindi Gandhi testified to Cipla's thinking for why they pursued the ANDA formulation.

Your Honor, industry praise, they hardly have anything. They primarily cite to this one reference. Yeah, it talks about Nayzilam, but it also talks about Valtoco. And in this case, at best, they haven't -- they haven't really shown any probative value in the praise they've shown, but certainly not wide-spread industry praise, which

13:55:23 is what the law requires.

13:55:24 Unexpected results, I'll start with one thing, 13:55:27 which is the *Janssen* case from two months ago, basically 13:55:30 said the starting point for unexpected results is that you 13:55:35 compare it to the closest prior art. They don't do that. 13:55:38 They don't tell me what the closest prior art is. They 13:55:41 don't compare it to that. They instead say, well, here's 13:55:44 why Nayzilam was great. They said it "achieved necessary 13:55:47 concentrations of midazolam." But as I mentioned, so did 13:55:50 *Wermeling*, so did *Merkus*, so did *Knoester*. They say, "while 13:55:54 maintaining a physiological pH." Well, *Wermeling* does that 13:55:57 as well. And then "a viscosity suitable for delivery 13:55:58 through a standard device." Well, the claim does not have 13:56:02 specific viscosity limitations. As I indicated to you 13:56:05 earlier, you could use higher viscosity, doesn't mean you 13:56:07 have to use a modified device.

13:56:09 And finally, licensing. For this, Your Honor, I 13:56:12 would have to -- unfortunately there's one highly 13:56:16 confidential slide in here. Everybody on the phone is okay, 13:56:19 but anybody would have to leave for just two minutes.

13:56:27 MS. HANSEN: Your Honor, I think we just would 13:56:29 want to double-check that everyone on the phone is under the 13:56:32 protective order.

13:56:36 MR. PATEL: I mean, I can confirm that they're 13:56:38 K&L Gates attorneys and two Cipla employees that we've told

them in advance are under the protective order.

MS. HANSEN: I know there is at least one person from the plaintiff's side has joined.

THE COURT: I don't know what you want me to do.

MS. HANSEN: Is it possible to just turn off the line for like 30 seconds, just mute the line from here? Is that a possibility?

THE COURT: Let's check and see if that's possible.

COURT CLERK: I muted. I don't know if they want to do a double-check.

THE COURT: All right.

MS. HANSEN: Also, just stay away from specific numbers too.

MR. PATEL: Well, nobody is on the line.

THE COURT: All right. Go ahead.

COURT CLERK: Is there a way to test before?

MR. PATEL: So Your Honor, they also cite to licensing. Sorry, they also cite to licensing. And again, licenses they cite to, they draw no nexus to the patents. And, in fact, all of those licenses took place for reasons other than the patents. [redacted] There's an ODE that expires, if you recall, in 2026, and then the patents expire in 2028. [redacted]

[redacted]

So again, their evidence of licensing is very thin and certainly suggests the opposite in terms of what was the value in their product. It was anything but the patents-in-suit.

And we can open the lines and call everybody in, but I'm going to, in the interest of time, go ahead and conclude.

THE COURT: All right. We'll unseal the courtroom.

MR. PATEL: And their corporate witness testified to that. They said they're not interested in the clinical program in 2019, but they were interested in 2017 because in 2017 when they looked at the case, it was well advanced. The clinical program had concluded, so they had more faith in actually commercializing the product.

And with that, I'll conclude, Your Honor, that Cipla contends that the asserted claims are anticipated, they're obvious in view of *Wermeling '359* and *CARBOWAX,* and secondary considerations are nowhere close to sufficient for overcoming a strong case of obviousness.

Thank you for your time.

THE COURT: Thank you.

MS. KEECH: Your Honor, may I approach?

THE COURT: Yes.

MS. KEECH: Thank you.

MS. HANSEN: Good afternoon, Your Honor. My name is Alexa Hansen for plaintiffs UCB Inc., UCB Biopharma SRL, Hanaja EHF and the University of Iceland.

As you just heard, Cipla has the burden of proving invalidity by clear and convincing evidence. This means providing evidence that places the factfinder, you, with an abiding conviction that the truth of the factual contentions are highly probable. They have not met their burden.

Let's briefly look at the claims here.

I want to point out a few things about the claims. And we've condensed them here, so we're able to see the limitations of the claims.

First, they're directed to a liquid pharmaceutical composition formulation for intranasal administration. And to answer Your Honor's question earlier, the parties have been operating as if this limitation is, in fact, limiting. You saw earlier in their slides they looked to whether or not *Wermeling '359* disclosed this particular limitation. So the formulation is not just a paper wait. It is something that has to have

certain properties. It has to be liquid, it has to be pharmaceutical and it has to be suitable for intranasal administration.

THE COURT: And that means -- I think I heard counsel for your opponent saying that means it has to work and be safe even though it doesn't necessarily have to be enough to get FDA approval. You agree with that?

MS. HANSEN: Correct, Your Honor, we do.

Both claims require at least midazolam and mPEG. And Claim 13 requires a particular combination of midazolam, mPEG 350, PEG 400, propylene glycol and water. And Claim 10 requires, in particular, a specific type of midazolam, midazolam base, as opposed to the salt form and mPEG.

Now, we've heard a fair amount about Nayzilam. Nayzilam was the first FDA approved rescue treatment for acute repetitive seizures. It's the product for which Cipla seeks to offer a generic version and is an embodiment of both claims.

As you just heard, Cipla raises two invalidity arguments, anticipation based on *Wermeling '359* -- and I apparently clicked two slides past. Anticipation based on *Wermeling '359* and obviousness based on the combination of *Wermeling '359* and the *Dow CARBOWAX Brochure*. Critically, both of these references were before the examiner and the examiner did allow the claims over these references.

Now, before we turn to the case law on the merits, I want to revisit what the record evidence established about what was known about mPEG in January 2007, which is the priority date here. Now, despite researchers searching for decades for a way to nasally administer benzodiazepine -- you can see here, this is Dr. Wermeling's slide where he talks about all of the different groups who were looking for various formulations to deliver intranasal midazolam, mPEG, which was first disclosed back in the 1940s, had never been used in any intranasal formulation and certainly not with midazolam.

So where had mPEG been used? Well, it had been used in one FDA approved topical gel, two bars of soap, and a vaginal lubricant. Because of those uses, mPEG had been listed in some pharmaceutical excipient handbooks as a solubilizer, among many, many other solubilizers.

And certain facts about MPEG's physical properties were known. For example, its structure and that it had a lower viscosity than PEG 400, but the same viscosity as propylene glycol.

I'll touch briefly on the POSA in this case, which defendants mention briefly as well. Now Dr. Smyth indicated that he thought it was important for the POSA to have intranasal formulation experience, given, as we'll discuss, the unique considerations that factor into the

delivery of an active dosage to the nose.

However, at the end of the day, this case does not come down to the definition of a POSA. We maintain under either definition Cipla has not met its burden.

Let's turn to anticipation. To show anticipation, Cipla must show that each and every limitation is found either expressly or inherently in a single art reference. In other words, there must be no difference between the claimed invention and the reference disclosure as viewed by a person of ordinary skill in the field of the invention.

There is no dispute, the parties do agree that the *Wermeling '359* reference does not expressly disclose one of the claim elements, mPEG. As Dr. Wermeling testified, the word mPEG appears nowhere in this application.

Now, it's not entirely clear to us, really, what legal standard Cipla is articulating to support their argument that PEG discloses mPEG. Is it inherency? Is it genus species? Is it the POSA's understanding of the word PEG? But it doesn't really matter because *Wermeling '359* expressly excludes mPEG from any definition of the word PEG. And that's because in the '359, where it talks about the diluents that you can use, it talks about "particularly polyhydroxy alcohols." This definition helps us, because mPEG is not a polyhydroxy alcohol.

Now, there was some brief reference that by disclosing the term alcohol, *Wermeling '359* is also disclosing mPEG and mPEG is an alcohol. But if we're looking to the genus of alcohols, alcohols are a huge class of compounds for which a person of ordinary skill in the art would not once envisage mPEG among all of the potential compounds which simply end with a hydroxyl group. Nor is it true that the POSA would have understood PEG to disclose mPEG. The experts agree that PEG and mPEG are not the same. Even if they are structurally similar, as Cipla has argued, that's not sufficient under anticipation case law, which, as we saw, requires that there be no difference between the prior art and the claim.

One of the references, Your Honor, that Cipla talked about, was a reference called the *Tracey '672* publication, which is the only application that they were able to show that had any linkage between PEG and mPEG. That is not a description of how the POSA in general would have viewed PEG versus mPEG. And certainly, looking to the *CARBOWAX Brochure*, that was a marketing brochure where *Dow* decided which compounds and which compositions that they were going to market together in the brochure. It doesn't suggest to the POSA, who is an intranasal formulator or even just a formulator, that grouping PEGs and mPEGs together somehow gives the POSA insight into what should work for an

intranasal formulation.

Now, Cipla argues that the POSA would have looked to PEG and immediately think of either the three liquid PEGs from the *Tracey '672* reference or the six liquid PEGs from *CARBOWAX*, but there are a couple of problems with that argument. First, *Wermeling*, by defining a PEG as a polyhydroxy alcohol, excludes mPEG from the purported genus. Now, we also saw an internal document from ITI, which defendants raised. However, there again, that's not prior art. That was made by the ITI company years after the invention had already been disclosed while they were working on it, therefore it's not a commentary about the prior art.

Second, if PEGs could be defined broadly to include derivatives like mPEG, then arbitrarily reducing the size of the genus to the three compounds from *Tracey '672* or to the six liquid PEGs and mPEGs of *CARBOWAX* is precisely the improper legal analysis that the *Janssen* court discounted back in 2012. There, the Court found the defendants relied on a key unsupported proposition. If a prior art reference discloses a genus containing a large number of species, a challenger may reduce the size of the genus by asking which species would have stood out to the skilled arts answer. Defendant's anticipation case turns entirely upon this proposition and they've shown no legal support for it. Because the *Wermeling '359* patent doesn't

disclose mPEG either expressly or inherently or as part of a genus or based on the understanding of the POSA, it follows that it also cannot disclose the combination of excipients in Claim 13 in particular.

With all of these failings, it is clear that Cipla's assertions do not rise to clear and convincing evidence of anticipation of Claims 10 and 13.

So let's turn to Cipla's obviousness allegations.

Cipla must prove that by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention and that the skilled artisan would have had a reasonable expectation from doing so. So in other words, Cipla would need to establish by clear and convincing evidence that the POSA here, as of January 2007, would have been motivated to combine *Wermeling* and *CARBOWAX*, would have been motivated to combine the *Wermeling* formulation with mPEG and water and reasonably expected that the resulting formulation would have been a successful intranasal pharmaceutical formulation. In other words, Cipla needs to show that the POSA would have reasonably expected the resulting composition would be useful as a pharmaceutical intranasal composition, balancing the competing factors that formulators consider when developing

such a composition.

So what are those factors?

Formulation of a pharmaceutical composition is a very particular endeavor. And intranasal formulation, in particular, is specialized. The nose is small, meaning that there are limits on the volume of a drug product that can be delivered and such that the active ingredient needs to be particularly concentrated.

Both experts also talked about how the nose has a specialized defense mechanism. Its developed a system to guard against unwanted intruders called the mucociliary clearance system. As part of that system, the knows is lined with cilia which serve to brush pathogens, dust, et cetera, out of the nose. And this means that a formulation that is delivered to the nose needs to be mindful not only of the volume, not only of the solubility, but also of the time constraints for absorption -- it has about 15 or so minutes before it's going to be brushed from the nose -- and also with a formulation that doesn't harm the cilia, which could detrimentally harm the nose's future ability to keep out future intruders.

As Dr. Smyth explained and Dr. Wermeling agreed, to make an intranasal pharmaceutical formulation, the POSA needs to consider several different factors. These include the solubility and concentration of the actives, the spray

volume, the pH of the formulation, the stability of the active in the formulation, the nasal absorption of the active through the membrane, which of course then takes into account the amount of time it stays in the nose, the viscosity of the formulation, both in terms of leaving the spray bottle and has to be sufficiently viscous to stay in the nose, sprayability and of course safety and tolerability.

As Dr. Smyth explained, if you change one of these factors in the formulation in an attempt to -- sorry. If you change one of the excipients in a formulation in an attempt to modulate one of the factors, you also have to consider what will the effect of that change be on the other factors. Now, viscosity is one of those factors that defendants have spoken at length about, but it's not only the viscosity of the formulation leaving the spray bottle that matters. As Dr. Smyth explained, if a formulation isn't viscous enough, it will run down the nose and into the throat. That leads to a loss of dose or a loss of efficacy.

The goal is to find a formulation that sufficiently balances all these factors to permit sprayability, but also be sufficiently viscous to stay in the nose for a while and permit the absorption of the active ingredient. And of course all this has to be done with excipients that allow for sufficient solubility of the

active and are not toxic, especially to the cilia. As with many aspects of drug development, it's a balancing act.

Now, before we delve into the issues of motivation and reasonable expectation of success, I wanted to stop to emphasize two points. One is that in developing an intranasal formulation, it's really tough. It takes a fair amount of work. And two, that was shown by the fact that in 2007, despite there being a very long-felt need for such a formulation, many had tried and failed to do so.

So let's look at that evidence briefly.

As you heard from both Dr. Klein and Dr. Privitera, acute repetitive seizures is a condition that can be truly debilitating for many patients with epilepsy. And as Dr. Klein explained, there was a need for intranasal formulations for treatment of ARS. Indeed, FDA agreed granting fast track status for Nayzilam. As Dr. Privitera explained, fast track status is granted for drugs meeting indications for which there is an unmet medical need.

Indeed, prior to this litigation, Cipla recognized that there was an urgent need for the availability of nasal formulations with highly increased midazolam concentrations as shown in their December 2018 application, which they filed at the WIPO. But despite the need existing for decades and the desirable intranasal route potentially identified to meet the need, the available

options for treating ARS came up short.

As of 2007, the things that were actually available to patients -- and I'll put a pin in that briefly -- were three. The first were oral benzodiazepines, but they have a limited use, because seizure patients cannot swallow a pill during a seizure or immediately thereafter and therefore for some patients whose next seizure was mere minutes away there just wasn't enough time to swallow a pill and wait for the time for the drug to be absorbed and reach the site of impact.

The second was the nasal administration of the intravenous formulation of midazolam. But that required delivery of 5 milliliters of dilute midazolam solution through what was known as a Mad device. Five milliliters is too large a volume for the nasal cavity to absorb so it required repeat doses of very large volunteers of liquid.

The third option was a rectally delivered gel, the undesirability of which Dr. Privitera agreed was self evident.

Now, with respect to the intranasal formulations that had previously existed prior to the January 2007 date, the key point there is none of those were available to patients.

Now, Cipla cited to a whole bunch of bioavailability data from the *Wermeling* formulation, from

the *Knoester* formulation, but bioavailability data alone is insufficient to show that it is suitable for an intranasal formulation. Is it safe? Is it tolerable? Has it achieved the stability requirements that it would need to be able to reach patients? None of that is known simply based on bioavailability data. In fact, as we saw, Cipla has argued that the *Wermeling* formulation had a viscosity problem.

The other point to keep in mind that Nasolam, which is the formulation that was later available in Europe, didn't exist prior to 2007. The formulation that was ultimately approved came around sometime in 2019. Now, the *Knoester* formulation appears to have been distributed in the Netherlands for many years, although, frankly, very little is known about that. It comes from a single line from a Nasolam EMEA registration that says that its been distributed by compounding pharmacies. But we don't know what that means. We also don't know what was available in the Netherlands. It's possible there really wasn't anything else and having something, anything, even if it's a terrible solution, is better than nothing.

Now, none of these options were sufficient to meet the need. And that's why, as many groups, by January 2007, had attempted to develop an intranasal benzodiazepine product.

Now, in addition to Dr. Wermeling, whose

formulation we've heard a fair about we also heard about, we all heard testimony of at least four other groups who were working on intranasal benzodiazepine formulations; Acorda, Jazz, Archimedes and Schwarz Pharma, which later became part of UCB.

Now, Cipla has made much of the fact that we keep pointing to benzodiazepine formulations rather than focusing solely on midazolam formulations, but the question on failure of others is whether others failed to solve the problem addressed by the patents-in-suit. The problem to be solved here was how to formulate an intranasal benzodiazepine because the benzodiazepines were known to have sufficient bioavailability and could stop seizures. In essence, something that could be administered as a rescue treatment for sufferers of ARS.

Now, midazolam is an active ingredient among others in the benzodiazepine class that could do so, but it wasn't the only one. Diazepam, lorazepam, clonazepam, all of these are additional benzodiazepines which, when administered, could potentially solve the problem of an intranasally administered solution to, for example, ARS. And thus, in line with *In re Cyclobenzaprine*, it's appropriate to consider failed attempts by others to develop nasally administered rescue treatments of any form without focusing solely on nasal midazolam treatments.

Now, Cipla does not disagree that prior to Nayzilam none of these formulations received FDA approval. And we're not suggesting that they had to, but instead Cipla suggested that these products were discontinued for financial, not technical reasons, but that's just not so. Certainly there can be no disagreement that, as Dr. Smyth described, the 2006 *Merkus* formulation, again, as distinct from Nayzilam, which was later approved, was a technical failure causing bone remodeling in dogs. That Dr. Merkus, over a decade later, was able to reformulate it into something else, that was approved in Europe, doesn't change the realities of the 2006 formulation failure. Nor can there be disagreement that Acorda terminated the Plumiaz trial because it showed lower than expected nasal absorption that would affect efficacy. Or that Jazz terminated its study based on preliminary pK data, another technical reason.

To be fair, there are some formulations that we don't know why they didn't go the distance. We do know that *Knoester* was never approved in the United States and we do know that ITI passed on its early midazolam and lorazepam formulations in lieu of Nayzilam. Companies don't always explain why they are terminating their program. The simple reality is companies aren't inclined to leave money on the table, especially where, as was the case here, a long-felt

need had existed for decades. If a product is technically promising, often they will try to sell it to somebody else, exactly what we saw with Nayzilam, which always found a buyer.

So with that background, on the considerations a POSA would have had for developing a pharmaceutical intranasal benzodiazepine formulation, along with an understanding of the decades of work that had already been undertaken littered by failures, let's turn to the priority date here in January 2007.

I spoke a bit earlier about what Cipla has to demonstrate to meet its heavy burden; namely, a motivation to combine the prior art in a manner that would arrive at the claimed pharmaceutical intranasal formulation with a reasonable expectation of success.

Now, Cipla attempts to turn that inquiry on its head. They rely on the idea that there was nothing that says don't use mPEG, nothing that says that it wasn't going to work. But that's not the analysis that needs to be conducted here. In general, under *KSR* and its progeny, Cipla has to show that the POSA, at the time of the invention, would have selected and combined the prior art elements in the normal course of research and development to yield the claimed invention rather than showing merely that the prior art included separate references covering each

separate limitation in the claim under examination. It is improper to do as Cipla has done, which is to go find the elements in the prior art regardless of whether or not they had been used in intranasal formulations, assume the combination and then ascertain if there was anything that said don't do this.

So from the perspective of a POSA, pre-invention, January 2007, what would have motivated the POSA in making an intranasal midazolam formulation?

Now, as we've heard, Cipla has articulated a couple of reasons that it asserts would motivate the POSA, which boils down to reducing the viscosity of the *Wermeling* formulation or reducing, but still keeping some propylene glycol also in the *Wermeling* formulation. But even if those two motivations existed, and we'll talk about that, mPEG would not have been the solution that the POSA would have selected when formulating a pharmaceutical intranasal midazolam formulation, and that's because as both experts testified, over the 60 or so years since the introduction of mPEG, mPEG had never before been used, marketed or even suggested for use in an intranasal formulation.

On the facts presented at trial, nothing in the prior art, over many decades, including, but not limited to, Wermeling's own published work, the *CARBOWAX* marketing brochure, and every other reference introduced indicated

that mPEG would have even been suitable or any intranasal formulation. Even Dr. Wermeling, an expert in the field of intranasal formulation, with far more experience and understanding than the POSA, admitted that he couldn't remember if he even knew of mPEG in 2007. He certainly didn't mention mPEG in 2009 when he proposed cyclodextrins to solubilize midazolam for intranasal use and he had never seen the *CARBOWAX brochure*. Now, we're not proposing to substitute Dr. Wermeling's knowledge or lack thereof for that of a POSA because that's not appropriate, but that Dr. Wermeling, with knowledge greater than a POSA, who spent years formulating different nasal products, didn't know about mPEG certainly supports our position that mPEG was an unknown excipient with unknown results in the nasal formulation space.

And indeed, as Dr. Wermeling admitted, *CARBOWAX* did not teach that mPEG could be used for nasal formulations, although *CARBOWAX* stated that PEGs could be used for liquid nose medications, it expressly did not include mPEG. When the *CARBOWAX brochure* discloses that both PEGs and mPEGs can be used for a particular application, it says so, demonstrating that there really was nothing in the prior art advocating for the use of mPEG in an intranasal formulation. It is illustrative that the best reference that Cipla can find that tangentially connected

mPEG to intranasal administration was *Tracey '672*, an obscure patent publication on sustained release injectable polymer pastes. And this is the same one where we saw that they showed that this inventor, in the context of this invention, explained that PEG can be PEG 200, PEG 400 or mPEG 350. But as Dr. Smyth explained, *Tracey* provided texts in two separate passages, one talking about the myriad viscosity reducers that are included within the '672 publication, something you might expect to see in something in an invention about pastes, and a separate paragraph about 30 or so paragraphs later that says that the polymer pastes could somehow be administered intranasally. But that's not evidence that the POSA would select mPEG for use in a liquid intranasal formulation as is claimed here. That no one, between the 1940s and 2007, had ever considered mPEG for any intranasal formulation, refutes motivation and reasonable expectation of success on its face.

Whereas here, nothing in the prior art directs a POSA to use mPEG in an intranasal formulation, much less with midazolam specifically. The mere fact that an excipient is generally disclosed in the art as a pharmaceutical excipient cannot render the claims obvious.

The *Unigene* case is particularly illustrative of this point. The excipient in question there was citric acid, which unlike mPEG at least, had been used in some

intranasal formulations, yet, despite that history, on summary judgment of non-obviousness, the Court explained that no reasonable juror could conclude that the claimed citric acid excipients of the intranasal formulation could have been obvious based on the disclosure that the excipient was in oral dosage form, a different route, an intranasal formulation, either for different purposes or with undesirable results, or as one of over 50 potential options.

The prior art relating to this case is even less on point, never suggesting mPEG's use in an intranasal formulation at all.

But let's assume that despite mPEG never being used in an intranasal formulation, mPEG would be among the excipients the POSA would have considered in developing an intranasal formulation. As I mentioned, Cipla has articulated two arguments that it says would motivate the POSA and I'll address each in turn.

Cipla's first articulated motivation is the POSA would have been motivated to use mPEG and water to reduce the viscosity of the *Wermeling* formulation. Not so.

There is no dispute that *Wermeling* uses a modified device, but nothing other than Dr. Wermeling's post hoc say so says that using a modified device was a problem to be solved. Indeed, *Wermeling '359* suggested that using a modified device was the solution. The *Wermeling* publication

provides not for viscosity reducers, but for viscosity enhancers, which may make sense as one of the issues in nasal formulation of course is having sufficient viscosity to stick in the nose.

And as both Dr. Smyth and Dr. Wermeling agreed, there's not a single statement in the *Wermeling '359* that viscosity reducers should be used. It wasn't until this litigation that Dr. Wermeling suggested that viscosity should be decreased so the device didn't have to be modified. But again, even if it was a problem, why turn to mPEG? It is worth observing that Cipla cites concern for regulatory hurdles; namely, the fact that the modified device would require some additional steps as motivation to reduce the viscosity of the formulation. But if that's a concern, why select an excipient that, because it's new, FDA will require two six-month safety studies in different species. That too is a regulatory hurdle. Nor would the POSA know that mPEG would, in fact, meaningfully improve the viscosity. There's not a single statement in the entirety of the '359 application or in the record evidence that teaches what the target viscosity should be in order to use an unmodified device.

Now, we saw some testimony from Dr. Ghaderi saying that common knowledge is that you should go as low as possible. But Dr. Ghaderi also said that you can't go too

low. Too low of a viscosity also won't work. And indeed, '359 suggests that a modified device is still needed for formulations using excipients that, like propylene glycol, have a similar viscosity to mPEG 350. So the POSA wouldn't of any expectation that using mPEG 350 would reduce the viscosity given that the viscosity is exactly the same as propylene glycol.

Nor would the POSA know how reducing the viscosity using mPEG would affect any of the factors the POSA would be concerned with when developing a nasal formulation. For example, what about nasal absorption. We heard Cipla remind us that Dr. Wermeling's testimony was that the *Wermeling '359* patent formulation had appropriate bioavailability in healthy humans. But that raises an unknowable question for the POSA. At lease based on the information we have, if the *Wermeling* formulation had been administered with the same ingredients, but a reduced viscosity, would it have stayed long enough in the nose to be absorbed? Nor, as the expert agreed, was there anything known about the solubility of midazolam and mPEG. Certainly the expert agreed that midazolam as partly soluble in water, so certainly adding water is not going to help its solubility. And as Dr. Smyth explained, there also wasn't anything in the prior art that discussed the tolerability of mPEG in any intranasal formulation.

Because the POSA would not know how mPEG affected these factors, the POSA would not have been motivated to select mPEG as the agent to reduce the viscosity of the *Wermeling* formulations.

Now, I'm only going to touch on this briefly. I know that Cipla rested on their papers. But the second potential motivation that Cipla argues for a POSA was to improve tolerability and that the POSA would have been motivated to replace propylene glycol or some portion of propylene glycol, since our claims still require propylene glycol, with water and mPEG, but there are a couple of issues with this proposed motivation.

First, in 2007 there was nothing public to suggest a problem with propylene glycol in intranasal formulations, let alone problematic in particularly the *Wermeling* formulation. And indeed, the *Merkus '893* reference extolled the benefits of propylene glycol in nasal formulations, calling a good solubilizer for midazolam and also attractive as a solubilizer because it does not have a strong adverse effect on ciliary movement.

Second, Cipla's reading for selecting mPEG, its similar viscosity to propylene glycol, has nothing to do with mPEG's tolerability in intranasal formulations, because of course that's not known.

And third, there's nothing to suggest that mPEG

would operate similarly to propylene glycol in solubilizing midazolam. As Dr. Wermeling acknowledged, that propylene glycol is an excellent solubilizer of midazolam. But the POSA would not know the solubility of midazolam and mPEG, and certainly, as we talked about, water wouldn't help.

And again, the POSA still does not know how mPEG would function in an intranasal formulation in terms of safety, tolerability or stability.

Now, Cipla says you could just test mPEG in various formulations. While that's true, that's true of any excipient and any formulation. Instead, the question is why would the POSA select mPEG to test in the first place? And what would you expect? Once you had selected mPEG, of course you could test it, but Cipla has offered no compelling motivation to select mPEG.

So now let's turn to reasonable expectation of success. Would the POSA, in January 2007, have a reasonable expectation of success that a formulation with midazolam and mPEG would be a successful intranasal pharmaceutical formulation ,that it would reasonably be expected to balance the factors a POSA would consider in developing such a formulation? The short answer is no.

Now, we've already touched on a number of these points. And one of them, interchangeability, we'll talk about in the context of reasonable expectation of success.

And the reason that we are talking about both of these sort of wholistically is because in the pharmaceutical context, if you don't know how an ingredient is likely to perform, it's a reason not to select it in the first place. But putting those concepts into the *KSR* framework, the POSA would not have reasonably expected that mPEG could be used in an intranasal formulation, much less in an intranasal formulation with midazolam, for the simple fact that no intranasal formulation with mPEG had ever before been used or suggested for use.

Largely glossing over these fundamental facts, Cipla tries to set up a proper definition of what constitutes success and the evidence it uses to show it. Cipla points largely, if not entirely, to structural similarity of PEG 400 and mPEG 350 to an assert that the POSA would know that mPEG would be fine in a pharmaceutical intranasal formulation. But that's far from sufficient, especially in the pharmaceutical arts, where potential solutions are less likely to be genuinely predictable.

As Your Honor is aware, methanol and ethenol differ by a single methyl group. If consumed, one will make you blind, the other will make you tipsy.

Similarly, as Dr. Smyth explained, the structural differences between PEG and mPEG would affect their physical and chemical properties.

Now, Cipla cited to the specification which showed that you could take a look at topical ingredients when selecting excipients for the formulations of that invention, but that's not commentary on the prior art, that's in the specification of the patents. And also the specification is broader than the claims. The specification includes topical formulations. The claims here are to intranasal formulations.

Indeed, Dr. Fisher, after the invention, expressed concern that mPEG might be toxic. Now we know that's not commentary on the prior art, but it is some suggestion that one of ordinary skill would not automatically assume that any composition is just automatically going to be non toxic.

Now, Cipla also suggested that the POSA would expect success based on ITI's representations. And we saw that this question that ITI asked FDA -- ITI was the company that developed Dr. Gizurarson's invention. They asked if based on the use of mPEG in various topical products, if FDA would allow them to move forward without additional testing. But what Cipla omitted was FDA's response where they said, no, the marketed products referred to are not relevant to the current proposed use.

There's a couple of issues. First of all, the questions that ITI are posing are questions being posed that

are not public, that are after the priority date and are being posed by folks who had at that point in time been working for several years with Dr. Gizurarson's formulations. Their perceptions cannot meaningfully reflect what the POSA would have thought pre priority date.

The second is the regulatory hurdles that Cipla was fond of saying would motivate the POSA to reduce the viscosity. Additional safety testing is a hurdle that it appears ITI was trying to avoid. Again, that doesn't reflect on what the POSA would have thought about the applicability of its use in topical products to its use in intranasal products before the priority date.

So now I'd like to talk a little bit about interchangeability. The defendants rely on *KSR* for the idea that solutions may be interchangeable if they're known in the field, have a predictable use, if they're familiar components, basically coming down to this idea that if there are a finite number of identified predictable solutions, that they, in fact, can be interchangeable.

But even using this standard, Cipla still cannot prevail for a very simple reason. MPEG was not part of a finite number of identified predictable solutions in the field of intranasal formulations.

Now, we've talked at length about how mPEG had never before been used in an intranasal formulation. It

14:38:32 wasn't an intranasal excipient. Therefore it wasn't an 14:38:37 identified predictable solution. But even if we focus on a 14:38:42 broader class, pharmaceutical excipients, then at that point 14:38:45 mPEG is no longer part of a finite number. There are myriad 14:38:51 known pharmaceutical excipients, far more than the 37 or so 14:38:55 solubilizers that Cipla relies on from the USP 2006 14:38:59 reference, many of which, including mPEG, do not have 14:39:03 predictable results when used in an intranasal formulation.

14:39:07 Indeed, as the evidence showed USP 2006 even 14:39:10 stated itself it wasn't a comprehensive list. And the POSA 14:39:15 would have known about other reference, like the IID, the 14:39:22 *Inactive Ingredient Database* and the *Handbook of* 14:39:23 *Pharmaceutical Excipients*, which both experts agreed were 14:39:25 widely used by formulators. The Handbook doesn't even 14:39:29 mention mPEG at all, and the IID contains all of the known 14:39:32 pharmaceutical excipients that have been used in FDA 14:39:34 approved products, thousands of pages of entries and it 14:39:37 contains one for mPEG as a topical formulation as compared 14:39:42 to even over a hundred for PEG. Even *Tracey '672*, which 14:39:47 Cipla relied on to show its link between mPEG and intranasal 14:39:52 formulations or how a POSA would understand the word PEG, 14:39:56 includes dozens of viscosity reducing agents, far more than 14:40:00 even what we saw in the USP 2006.

14:40:06 Indeed, *Almirall* bears us out. This is one of 14:40:10 the two cases that Cipla cited. There, the claims were

directed to a topical pharmaceutical composition with the compound dapsone. And the claimed excipient in question was called an ASA agent, what was referred to as the Sepineo gelling agent. The prior art also included a number of different compounds including Carbopol, which was also known in the prior art for use in topical formulations with water and soluble drugs like dapsone.

The Federal Circuit there concluded that what justifies a finding of interchangeability was that the interchangeable gelling agents were known for use in topical formulations with water and soluble drugs which is what the claims at issue there covered.

Here, we have bits and pieces of information. They have the same viscosity. Maybe based on their structural -- the shared structural components, they will have the same solubility, but there's no understanding about how mPEGs function on a whole as compared to the excipients that it would be replacing. That we just don't know.

The key finding was that the excipients were interchangeable because they were being viewed as a whole. They had been used in topical formulations and they had both be used for water and soluble drugs. MPEG just wasn't known here as an intranasal formulation. Nor really does *Almirall* stand for the proposition that interchangeability can replace a finding of motivation. To the contrary, the fact

that the excipient in question, the Sepineo, was known for use in topical compositions was a key finding underlying the Board's finding of motivation in that case.

The other case that Cipla cited was In re Omeprazole. And in that case the prior art disclosed this compound called arginine, which the patentee there, Astra, had repeatedly described what was called an ARC salt. The claims at issue, Astra's own claims, used three different ARC salts. The district court there relied on the evidence that it was the actual practice, it was common in the field, for scientists to substitute the claimed salts for the arginine salts. And that was the reason why they found interchangeability in the context as a whole, not based on a particular property here or a particular property there.

The interchangeability theory, based on, as Cipla explains it, identifying excipients with a single similar property as interchangeable for all purposes, cannot been an end run around obviousness. The law does not allow for that. Interchangeability is also difficult to square request Claim 13, which requires, in addition to mPEG 350, both PEG 400 and propylene glycol. Cipla doesn't address why the POSA would be motivated to change PEG 400 or propylene glycol for mPEG but still keep PEG 400 and propylene glycol.

We'll speak a bit more about this later, but if

mPEG were so interchangeable with other excipients then it should have been easy for Cipla to design around the asserted claims here. But despite three years of efforts, the Cipla ANDA product contains mPEG. This confirms mPEG is not interchangeable with other excipients.

In a last ditch effort to reframe what was known in the art, Cipla points to the inventor's own path, but that is never appropriate. Cipla attempts to justify its reliance by characterizing Dr. Gizurarson's comments merely as evidence of what a POSA would have understood while reading the prior art. But in November 2007, when the document that they're citing was made, not only was Dr. Gizurarson the inventor by definition, not the POSA, but Dr. Gizurarson had also had 20 plus years of experience in intranasal formulation. What Cipla relies on are the statements from the inventor made after the priority date, augmented, as they admit, through the lens of his own invention, with stability and sprayability testing.

The critical difference between the inventor in November 2007 and the POSA in January 2007 is, as the Federal Circuit observed in 2019 in *Neptune Generics*. "Here, the statements Petitioners argue establish the state of the art were made in December 1999, more than five months after the critical date. As the Board found, the views Lilly expressed about the prior art references in its

communications are made through the lens of what they had invented. Therefore, it declined to read the other prior art references in view of these communications. In doing so, the Board did not err."

The deck Cipla keeps pointing to is this post priority date "pitch deck" where Dr. Gizurarson was attempting to sell people on his invention. He wasn't characterizing the prior art or suggesting, as was the case in *In re Copaxone*, was a natural next step in light of just the prior are would have been. Instead, he's communicating potential opportunities for his discovery through the lens of what we had invented or what he had invented.

Before I close out our discussion as to why Cipla hasn't met its burden, I'd like to revisit the evidence that plaintiffs have adduced with respect to indicia.

First I'd like to talk a little bit about nexus. Nexus -- one of the requirements of nexus is that the claimed objective indicia is coextensive with the claims. And in this case the only thing for which we have a lot of evidence is Nayzilam, which the parties agree are an embodiment of the claims. If there were other embodiments out there other than Nayzilam, we, of course, would try to rely on evidence, but there isn't. The only think that exists is Nayzilam. And thing like long-felt need and

failure of others, and copying, are not tied to Nayzilam, they are factors that exist outside of Nayzilam and even exist or are supposed to be analyzed prior to Nayzilam.

So we talked a little bit about long-felt need and failure of others. With respect to long-felt need, when Nayzilam was introduced in 2019 it was the first FDA approved nasally administered benzodiazepine. It met the long-felt need for a nasally administered benzo, and unlike these failures that we talked about, achieved the gold standard of success, FDA approval.

Now, the reason that there is a menu of options for the treatment of acute repetitive seizures is precisely because one size doesn't fit all. Nayzilam provides a solution for patients who couldn't swallow pills before their next seizure, who didn't want to receive a rectal gel, or didn't want five milliliters of solution sprayed into there knows. Nayzilam was for those patients.

Now, Cipla tries to discount Nayzilam's success by observing that Valtoco, an intranasal diazepam product, was approved about eight months later. But later approved products do nothing to diminish that Nayzilam met a long-felt need in 2007, and in particular, met a long felt need that even Valtoco would not meet. As Dr. Klein and Dr. Privitera both admitted, they both prescribe Valtoco and Nayzilam, approximately equally.

But now I'd like to briefly talk about a few additional examples of real world evidence praising nonobviousness. On praise, it's not just an article that talks about -- that praised Nayzilam as a game changer. Cipla also praised mPEG in particular as a novel and special excipient that allowed Nayzilam to meet a critical, unmet clinical need.

On unexpected results, Dr. Smyth explained that it was unexpected that mPEG, this excipient that had never before been used in an intranasal formulation, would achieve the necessary concentrations of midazolam while maintaining physiological pH and suitable viscosity.

Now Cipla chides us for not identifying the closest prior art and in this case it really doesn't matter what the closest prior art was. Because of mPEG, no one knew how it would function, no one knew what to expect, therefore the results are unexpected.

Dr. Smyth also explained the complicated licensing path for Dr. Gizurarson to UCB. And certainly the patents were included in the licenses, each of the licenses that were brought to bear. Cipla's reliance on UCB's financial forecasts to suggest that UCB didn't value the patents is misplaced. Cipla ignores the fact that there may have been concerns about non-infringing alternatives that designed around the narrow scope of the claims.

14:49:27 And that leads us to the final objective indicia, copying. Cipla spent three years developing its ANDA product. As Dr. Smyth explained, despite attempting dozens of formulations, each using myriad different excipients, the Cipla ANDA formulation is an exact copy of Nayzilam. Now, Cipla attempts to push this down by saying, well, we had something that was better, but we decided to go for something that was, as they called it, Q1/Q2. Well, they didn't have to. They didn't have to follow that route. They didn't have to file their ANDA at that time. They could have continued to develop. They could have tried to find a formulation that they -- that met the requirements that allowed them to pursue a non Q1/Q2 product. They chose not to do that.

14:50:16 Indeed, Cipla has spent much time here explaining how mPEG is interchangeable with a number of different excipients. If so, then Cipla should have been very easily able to develop a bioequivalent formulation to Nayzilam without using mPEG. It was unable to do so.

14:50:37 Now, Cipla attempts to downplay any of its copying by pointing to *Janssen* and pointing to other cases which explain that copying is not probative when the claims address aspects of a drug that impact its bioavailability and bioequivalence. But the case law demonstrates that copying can matter in the context of an ANDA, that Cipla did

not need to copy, as they did here, Nayzilam's formulation ingredients to achieve bioequivalence. The whole concept of interchangeability is that there should be multiple routes to get to the same solution. If that's true, then there's no reason that Cipla had to copy the Nayzilam formulation. Indeed, Cipla's protestation that Nayzilam is obvious now is like that found in the *Heidelberger* case, of "diminished weight when offered by those who had tried and failed to solve the same problem, and then promptly adopted the solution that they are now denigrating."

In sum, Your Honor, defendants have a very high burden, putting you in the position where you have abiding conviction that the truth of defendant's factual contentions are highly probable. But as we've shown time and again, Cipla falls short.

We respectfully ask that you find Cipla has not met its burden and that Claims 10 and 13 are not anticipated or invalid for obviousness.

Thank you.

THE COURT: Thank you. Counsel?

MR. PATEL: Your Honor, I have approximately four minutes on the record. I'll make two or three quick points.

THE COURT: Okay. Great.

MR. PATEL: Opposing counsel mentioned that

Cipla points largely to the structural similarities between PEG and mPEG to support its motivation to combine. But Your Honor, in this case, as I pointed out earlier, not only are PEG -- is PEG and mPEG structurally similar, but then we went through the *Dow Brochure* as an example of how the *Dow Brochure* teaches that they have similar properties as well. So it's not just that the structures of mPEG and PEG were available and one of ordinary skill in the art was just relying on the similarity in the structure. There was additional prior art that showed that similarity in the structure did indeed lead to relatively similar properties.

Second, they say that the specification, when it talks about excipients in a topical -- excipients used in a topical space being used for intranasal, it's not commentary of prior art. However, if you read the language, it says a person of ordinary skill in the art. That's how that starts, so it's teaching what a person of ordinary skill in the art would know already.

Third, they say the USP is not a comprehensive list. You recall I showed a list of solvents where there were 31 solvents, water was four of those, and then polyethylene glycol and methoxy-polyethylene glycol were listed. Well, even when it's not a comprehensive list, out of those 31, they thought to list polyethylene glycol and methoxy-polyethylene glycol as commonly used solvents for

pharmaceutical formulations.

And finally, they talk about the time between seizure. I'll cite to DTX-2375, which is the *Fisher* publication. And in Table 3 on page 4 of that publication, it's clear that number of seizures that occur within the time interval between first and second seizure being ten minutes is less than 0.7%. Less than 30 minutes is 6.4% and less than 60 minutes is 12.5%.

Thank you.

THE COURT: Thank you very much. All right. That will conclude today's oral argument. I appreciated the presentations. They were very well done. We have a lot to think about. We'll get you something as soon as we are able, although my recollection is that we do have some time.

Could somebody just refresh my recollection about that.

MS. HANSEN: Yes, Your Honor. Nayzilam has what's called orphan drug exclusivity, which does not expire until May 2026.

THE COURT: Great. All right. Thanks very much.

COURT CLERK: All rise.

(Court adjourned at 2:54 p.m.)

---------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court